WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Amanda Mix, | No. CV-14-02357-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Asurion Insurance Services Incorporated, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff Amanda Mix's motion for class certification and appointment of class counsel pursuant to Federal Rule of Civil Procedure 23. (Doc. 65.) Also pending before the Court is Defendant Sterling Infosystems, Inc.'s ("Sterling") motion to dismiss for lack of jurisdiction. (Doc. 107.) For the following reasons, the Court denies Mix's motion and denies Sterling's motion.

## BACKGROUND

### I.    Fair Credit Reporting Act

Congress enacted the Fair Credit Reporting Act ("FCRA") "to ensure fair and accurate credit reporting, . . . and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). FCRA imposes certain requirements whenever a consumer report produced by a consumer reporting agency is used for employment purposes. A consumer report is defined as "any written . . . communication of any information by a consumer reporting agency bearing on a consumer's . . . character, general reputation, personal characteristics, or mode of living which is used or expected to be used . . . for

the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes . . . ." 15 U.S.C. § 1681a(d)(1)(B).  A consumer reporting agency ("CRA") "means any person which . . . regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties . . . ." *Id.* § 1681a(f).  A consumer report is used for employment purposes when it is "used for the purpose of evaluating a consumer for employment . . . ." *Id.* § 1681a(h).  Within the context of employment, "adverse action . . . means . . . a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee. . . ." *Id.* § 1681a(k)(1)(B)(ii).

A person who intends to use a consumer report for employment purposes may only do so if "a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and . . . the consumer has authorized [it] in writing . . . ." *Id.* § 1681b(b)(2)(A).  "[B]*efore* taking any adverse action . . . the person intending to take such adverse action shall provide to the consumer to whom the report relates . . . a copy of the report; and . . . a description in writing" of the consumer's rights under FCRA.  *Id.* § 1681b(b)(3) (emphasis added).  A CRA may only furnish a third party with a consumer report for employment purposes if the third party "certifies" to the CRA that the third party "has complied with" § 1681b(b)(2) and, if applicable, "will comply with" § 1681b(b)(3).  *Id.* § 1681b(b)(1)(A).

Violations of FCRA subject the offender to varying levels of liability depending on culpability.  "Any person who is negligent in failing to comply with any requirement [under FCRA] with respect to any consumer is liable" for "actual damages" plus the costs of the litigation and reasonable attorney's fees.  *Id.* § 1681o(a).  "Any person who willfully fails to comply with any requirement [of FCRA] with respect to any consumer is

liable" for either "actual damages" or statutory damages of $100 to $1,000 per violation,[1] along with costs of and attorney's fees, and in some cases punitive damages.  *Id.* § 1681n(a).

## II.   Factual Background

In early July 2014, Mix applied for a technical support position at Defendant Asurion Insurance Services Inc.  ("Asurion")  Mix applied to Asurion through PeopleScout, a third-party vendor that assists Asurion with its recruiting efforts.  On July 11, 2014, Asurion interviewed Mix at its office in Phoenix, Arizona.  As part of its normal application process, Asurion required Mix to sign a form consenting to a background check[2] (including a criminal background check) conducted by co-defendant Sterling.  On July 16, 2014, Mix completed and signed the consent forms comprising a three- to five-page packet of documents. At the time of her application Mix understood that the background check would include a criminal check. The next day, an Asurion recruiter submitted the pertinent information to Sterling to begin the background check.[3]

On July 18, 2014, Mix received an email from Asurion extending her a conditional offer of employment contingent upon, among other things, the results of her background check.  Mix accepted the offer and agreed to start training on July 28, 2014.  Asurion sent a second confirmation email on July 22, 2014, confirming that Mix had accepted the offer and would be starting on July 28, 2014.

In the meantime, Sterling ran Mix's background check.  Sterling's background check system is known as its managed Client Matrix Application service.  A client matrix is unique to each employer-client and consists of a set of standards that Sterling then uses to score background check reports for that particular employer.   Sterling processed

---

[1] The statute does not provide guidelines for determining what number within this range should be awarded in any given case involving statutory damages.

[2] There is no dispute that Sterling's background check constitutes a "consumer report" as defined by § 1681a(d)(1)(B).

[3] Asurion, as a user of consumer reports for employment purposes, is subject to the requirements set out in § 1681b(b)(2) and § 1681b(b)(3).  Sterling is also subject to the FCRA regulations governing CRAs, including § 1681b(b)(1).

Asurion's requests for background checks utilizing three platforms:  ScreeningDirect, AISS, and SterlingDirect (East).   The process within each platform is allegedly indistinguishable, except to the extent that the platforms employ variations of scoring language.   ScreeningDirect's background check scores included, at that time, green (meets hiring criteria), yellow (needs further review), or red (does not meet hiring criteria), as well as Pass or Fail.   ScreeningDirect now scores background checks as Level1, Level2, or Level3, as well as Pass or Review.   SterlingDirect (East)'s background check scores included, at that time, Alert, Provisional, or Clear.   AISS's background check scores included, at that time, Alert, Informational, or Clear.

Using the ScreeningDirect platform, Sterling scored Mix's background check as red.   The basis for this was a pending criminal charge in another state.   Mix does not contest that the charge was pending at the time Sterling ran the report.   Mix does, however, state that at that time she had "already worked out an agreement with the prosecutor to get the charge expunged from her record."  (Doc. 65 at 11).

Upon completion of the background check, Sterling's system automatically emailed Asurion the results, which indicated that Mix did not meet Asurion's hiring criteria.  (Doc. 41-4.)  As a result of Mix's background check, Asurion decided to revoke Mix's employment offer.   Thus, on July 25, 2014, soon after receiving and reviewing the results of Mix's background check, Asurion requested that Sterling initiate its "Managed Adverse Action" service.   The service triggers the creation of a pre-adverse action notice letter that Sterling sends to a rejected candidate on behalf of Asurion.   At Asurion, Mix's name was moved to a document listing candidates who are to be removed because they "will not start."  (Doc. 65-2 at 12.)

Asurion also informed PeopleScout recruiter Marty Grubb that Mix did not meet Asurion's hiring criteria.   Grubb informed Mix that same day that because of the results of her background check Asurion was no longer able to offer her employment.  (Doc. 41-3.)  Grubb's email further informed Mix that within a week she would receive a letter from Sterling that would provide her with a copy of her background check results and

instructions on how to dispute them.  PeopleScout also called and left Mix a voicemail to the same effect.

Mix's start date was scheduled for July 28, 2014.  Mix received Sterling's pre-adverse action notice letter dated July 25, 2014 sometime shortly thereafter.  (Doc. 41-4.) The letter had no clear title or subject line, and although the letter was drafted and sent by Sterling, it appeared to come from Asurion.  The letter explained that Asurion contracts with Sterling to conduct its background checks, and stated the following:

> Based on this information [from Mix's background check], subject to you successfully challenging the accuracy of this information, we have decided to revoke your conditional offer of employment.  STERLING INFOSYSTEMS has not made this decision and is not able to explain why the decision was made.

(*Id.*)  The letter included a copy of Mix's background check as well as a summary of her rights under FCRA.  This is the first instance where Mix was given access to her background check.  The letter further informed Mix that she could dispute the "accuracy or completeness" of the results of her background check directly with Sterling, but that she needed to do so within five business days of the receipt of the letter, and that if she chose to dispute the results, she also needed to contact Asurion.  (*Id.*)  The letter provided contact information for both Sterling and Asurion.  (*Id.*)

Mix did not dispute the results of her background check.  Pursuant to the terms of the Managed Adverse Action service, if the subject of the background check initiates no dispute within five business days, Sterling, on behalf of Asurion, sends a final notice of adverse action letter to the applicant.  Thus, Mix eventually received the final notice of adverse action letter stating that Asurion could no longer consider Mix for employment. The letter was dated August 1, 2014.  (Doc. 100 at 22.)

## III.   Alleged Violations of FCRA

Because Mix does not allege that the information provided to Asurion by Sterling was inaccurate, nor does she allege that she took any steps to dispute it, Mix does not seek any actual damages authorized by the statute.   Rather, Mix complains of

Defendants' alleged failures to comply with statutory procedural mandates. She thus seeks to recover the specified amount of statutory damages for each of the Defendants' alleged willful failures to provide her with the necessary procedures. She can make no claims, as authorized by the statute, based on the alleged negligence of the Defendants.

Count I of Mix's complaint raises several alleged violations of § 1681b(b)(3)(A) against Asurion. Mix first alleges that Asurion violated FCRA when, in response to procuring Mix's consumer report from Sterling, it took adverse action against Mix via the July 25, 2014 email from PeopleScout without first providing Mix with a copy of her background check or a description of her FCRA rights. Mix also alleges that Asurion committed a separate violation when it prevented Mix from starting on July 28, 2014, her original start date, without first providing her with a copy of her background check and a description of her FCRA rights. Finally, Mix alleges that by mailing its final adverse action letter on August 1, 2014, Asurion failed to give Mix adequate time to review and dispute the results of her background check before being terminated.

Count II alleges that Asurion violated § 1681b(b)(2) when it requested a consumer report about Mix without first presenting Mix with a clear and conspicuous written disclosure document consisting solely of the disclosure.

Count III alleges various claims in the conjunctive or alternative against Sterling, again all constituting violations of § 1681b(b)(3)(A). Mix first alleges that Sterling violated the statute when it took adverse action against Mix without first providing her with a copy of her background check and a description of her FCRA rights. Mix alleges Sterling took adverse action itself when, between July 23 and July 25, 2014, it reported to Asurion the content of Mix's consumer report and flagged for Asurion that Mix failed to meet Asurion's employment qualifications. Mix also alleges that Sterling's July 25, 2014 letter, sent on behalf of Asurion, which revoked Mix's employment offer but included a copy of Mix's report and a description of her FCRA rights, violated the statute, because a copy of her background check and a description of her rights needed to be sent in a previous letter to comply with the law. Mix further alleges that by mailing the final

adverse action letter on August 1, 2014, Sterling failed to give Mix adequate time to review and dispute the results of her background check before being terminated.

Count IV re-alleges Count II, but against Sterling.

Count V alleges that Sterling violated § 1681b(b)(1), which requires that Sterling only furnish consumer reports to Asurion if Asurion certifies that it will comply with § 1681b(b)(2) and (b)(3). Mix alleges that Sterling furnished Asurion with consumer reports knowing that Asurion did not comply with those sections.

Mix seeks to certify two classes and one sub-class, each comprising members who, she alleges, suffered the same FCRA violations.

## DISCUSSION

### I.    Standing

Defendant Sterling has challenged Mix's Article III standing as to her claim in Count III, alone, in a motion to dismiss filed subsequent to Mix's motion for class certification. (Doc. 107.) Nevertheless, "[f]ederal courts are required *sua sponte* to examine jurisdictional issues such as standing." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (en banc). The Court thus finds it necessary—especially in light of the Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)—to analyze whether all of Mix's claims satisfy the requirements of Article III standing.

"A plaintiff has the burden to establish that it has standing," *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015), and "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Article III standing requires that the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Injury in fact, the "[f]irst and foremost" element of standing, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998), is established if the plaintiff shows that "he or she

suffered an 'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

The Supreme Court's recent decision in *Spokeo, Inc. v. Robins* dealt with the question of injury in fact in the context of an alleged violation of FCRA. The holding of *Spokeo* was narrow and only addressed the inquiry a court must make when assessing injury in fact. According to the Supreme Court, when a plaintiff alleges an injury in fact, and when a court determines whether that injury is "concrete and particularized," the court must consider concreteness and particularity as two separate, distinct inquiries. *Id.* at 1548. A court may not simply say that because an injury is particularized, it is necessarily concrete. *Id.* The *Spokeo* decision did not, however, purport to draw the line between a "bare procedural violation" lacking concrete harm and a concrete injury in fact. The holding of *Spokeo* was simply that a court must separately consider both concreteness and particularity to make a finding of injury in fact. *See id.* at 1550 ("We take no position as to whether the Ninth Circuit's ultimate conclusion—that Robins adequately alleged an injury in fact—was correct.").

In remanding the case to the Ninth Circuit, the Supreme Court summarized the concreteness inquiry a court must undertake. An injury is concrete if it is "de facto," that is, "it must actually exist." *Spokeo*, 136 S. Ct. at 1548 (citing Black's Law Dictionary 479 (9th ed. 2009)). Congress may, however, "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law"; thus, in certain circumstances, alleged intangible injuries like the "risk of real harm" may establish concrete injury. *Id.* at 1548–49 (citations omitted). Nevertheless, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 1549. Thus, a plaintiff cannot "allege a bare procedural violation, divorced from any

concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). Applying these principles to FCRA, the Court concluded that "[a] violation of one of the FCRA's procedural requirements may result in no harm"; accordingly, such a "bare procedural violation" absent concrete injury would not be sufficient to confer standing. *Spokeo*, 136 S. Ct. at 1550. A necessary corollary to this finding is this: Even coupling a "bare procedural violation" with a statutorily-authorized remedy (as FCRA does) does not necessarily create a concrete interest the deprivation of which causes concrete injury in fact.

Several different district courts have dealt with post-*Spokeo* standing questions with respect to FCRA. One such case, which Plaintiff cites, is *Thomas v. FTS USA, LLC*, No. 3:13-cv-825, 2016 WL 3653878 (E.D. Va. June 30, 2016). *Thomas* concluded that "the proposition that '[t]he . . . injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing' survives *Spokeo* subject to qualification, depending on the facts of each case and the considerations articulated above, but nevertheless intact." *Id.* at *6. After analyzing the legislative history of FCRA at great length, the *Thomas* court determined that FCRA's procedural safeguards vested certain substantive rights in consumers that would on their own satisfy Article III's injury in fact requirement if violated. *See id.* at *6–8. The plaintiff in *Thomas* alleged the same two violations of FCRA as the plaintiff here: a failure to provide timely notice of adverse action under § 1681b(b)(3) and a failure to provide a proper disclosure under § 1681b(b)(2). The facts of *Thomas*, however, are distinct in an important aspect. In *Thomas*, the initial report produced by the reporting agency *incorrectly* contained numerous felony convictions, including, amongst others, drug and statutory rape convictions. *Id.* at *3. It seems clear that where a consumer report contains false information of this kind, its provision to a prospective employer without

providing the potential employee a chance to first see and correct that information creates a concrete injury in fact. *See Thomas*, 2016 WL 3653878, at *8–9, *11–12. But in this case, Sterling disseminated *true* information to the employer, information which Mix never contested.

But the broad principle that the holding in *Thomas* rests on—that the violation of statutory rights may in itself be a concrete injury—is not limited to situations where the violation of those rights results in the dissemination of false information. The proper inquiry is whether a procedural violation creates a "risk of real harm." *Spokeo*, 136 S. Ct. at 1549–50; *see also Lujan*, 504 U.S. at 573 n.8 ("We do *not* hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."). In the context of employment-related background checks, information that is true but amenable to contextual explanation, delivered without time to provide that explanation, does create a risk of real harm. *See Thomas*, 2016 WL 3653878, at *12 ("Even if all of the subclass members' consumer reports were entirely correct . . . the sub-class members were deprived of the opportunity to explain any negative records in their consumer reports and discuss the issues raised in their reports with Defendants before suffering adverse employment action."); *Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 634 (D. Or. 2015) ("[T]he applicant must have enough time between the notice and the final decision to meaningfully contest or explain the contents of the report."). The same is true for a disclosure that, because it is merely one section of a larger document, results in "information overload" which inhibits a consumer's ability to agree to a background check with full knowledge of their rights and the potential consequences.

The disclosure requirements of § 1681b(b)(2)(A) were at issue in another post-*Spokeo* district court case, *Meza v. Verizon Communications, Inc.*, No. 1:16-CV-0739 AWI MJS, 2016 WL 4721475 (E.D. Cal. Sept. 9, 2016). In that case, the court considered whether a document that "did not consist solely of the disclosure, but included additional provisions not authorized by the FCRA," when the plaintiff did not "allege that

any information was incorrectly reported or that he suffered any negative consequences whatsoever," created a concrete injury so as to confer standing on the plaintiff. *Id.* at *2. After examining *Spokeo*, the court, citing *Thomas*, found that FCRA created two substantive rights through the statutory disclosure requirements: a "right to specific information in the form of a clear and conspicuous disclosure" and a "right to privacy in one's consumer report that employers may invade only under stringently defined circumstances." *Id.* at *3 (quoting *Thomas*, 2016 WL 3653878, at *7). Thus, the court concluded that the violation of the statutory provision caused both an "informational injury" and a "privacy invasion" sufficient to confer standing. *Id.* at *3–4.

This reasoning is applicable not only to the disclosure requirements of § 1681b(b)(2) but also to the notice requirements of § 1681b(b)(3) and the certification requirements of § 1681b(b)(1). *Spokeo* acknowledged that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," and that "a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." 136 S. Ct. at 1549. Statutory provisions intended to protect against harms identified in the statute create substantive rights, the deprivation of which causes a concrete injury. FCRA's text identifies the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). Violations of FCRA that unfairly deprive a consumer of relevant information, or obtain consent for a background check without a statutorily-proper disclosure, implicate the harms Congress identified in FCRA, and thus cause concrete harms.

An examination of Mix's Amended Complaint indicates that these are the harms for which she seeks redress. Counts I and III are not identical, but they assert the same basic violation against Asurion and Sterling. Both parties allegedly violated § 1681b(b)(3)(A) by taking adverse action against Mix "without first providing her a copy of the report or a description of her FCRA rights." (Doc. 41 at 18, 21.) Sterling ran the report in late July 2014, and the report reflected information about Mix that was both

true at the time and served as a red flag on the report. Then, Mix alleges, between July 25, 2014 and August 1, 2014, Asurion and Sterling took the supposed adverse actions underlying Counts I and III. (Doc. 41 at 18–19, 21–22.) She cites three actions by each defendant as "addition[al] or . . . alternative" violations of FCRA: (1) Asurion's e-mail of July 25, informing Mix that she would not be hired, sent before Mix received a copy of her report and a notice of her rights; (2) Asurion's not permitting Mix to start on July 28, also prior to Mix receiving her report and notice; (3) Asurion's letter of August 1, "permanently revoking [Mix's] offer of employment," which did not give Mix "sufficient time to address the content of the report"; (4) Sterling's provision of its background check results to Asurion on July 25, without first providing Mix with her report and notice; (5) Sterling's letter of July 25, sent at the same time as Mix's report and notice; and (6) Sterling's mailing of the August 1 letter without giving Mix a "reasonable opportunity to successfully challenge the report." (*Id.*)

Without deciding on the merits of Mix's argument that any or all of these actions are (1) adverse actions that (2) violate the requirements of § 1681b(b)(3), the resulting consequences appear to be the type of "informational injury" identified in *Thomas*. In her briefing addressing one of Asurion's arguments against class certification, Mix plainly admits "the procedural nature of [her] claim. It does not matter *why* Asurion chose to reject her application. She is not suing Asurion because it did not hire her. She is suing it because it took adverse action against her without providing her notice and an opportunity to explain her side of the story." (Doc. 87 at 4–5.) This is sufficient to allege an informational injury to support standing as to both Counts I and III. Sterling's motion to dismiss Count III is denied.[4]

---

[4] Sterling points out that Mix did not initially read the first letter that Sterling sent, and argues that she therefore could not have been harmed by any language that would have misled an objectively reasonable reader into believing it was too late to contest her results. (Doc. 107 at 15.) But the harm Mix alleges, strictly speaking, is not that the letter misled her; it is that she did not receive the report and notice prior to receiving the letter. There is still a question of whether the letter constitutes adverse action under FCRA, and the objectively reasonable interpretation of the letter's language is relevant to that inquiry. For standing purposes, however, the fact that Mix did not initially read the letter is irrelevant.

Similarly, Mix's Counts II and IV also allege a violation of § 1681b(b)(2)(A) that adequately alleges injury in fact sufficient to support Article III standing.  FCRA requires that an employer seeking to procure a consumer report for employment purposes must first provide a prospective employee with "a clear and conspicuous disclosure . . . in a document that consists solely of the disclosure . . . ." § 1681b(b)(2)(A).  Mix alleges that Asurion and Sterling supplied her with a multi-page packet containing a FCRA disclosure along with other items.  This arguably created a risk that Mix's information would be disseminated without her fully informed, knowing consent, violating her privacy rights as recognized in FCRA.  Mix's Counts II and IV are thus sufficient for standing purposes.

Count V implicates the same privacy harms as Counts II and IV.  If a CRA disseminates a consumer's information without ensuring that the recipient will comply with provisions intended to protect the consumer's privacy, there is a real risk of harm to the consumer's privacy interests.  Count V also therefore sufficiently alleges standing.

Because the Court concludes that Mix has standing to bring this action, the Court need not engage in a standing analysis for potential class members.  *See Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements . . . ."); *see also Moore v. Apple Inc.*, 309 F.R.D. 532, 541–42 (N.D. Cal. 2015) ("[T]he problem of uninjured absent class members is a problem of Rule 23, not of Article III." (quoting Newberg on Class Actions § 2.3)); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 553 (C.D. Cal. 2011) ("[W]here the class representative has established standing and defendants argue that class certification is inappropriate because unnamed class members' claims would require individualized analysis of injury or differ too greatly from the plaintiff's, a court should analyze these arguments through Rule 23 and not by examining the Article III standing of the class representative or unnamed class members.").

## II.    Class Certification

Class certification under Rule 23 is a two-step process.  First, a plaintiff must "be prepared to prove that there are in fact sufficiently numerous parties, common questions

of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotations marks and citation omitted).   Second, a plaintiff must "satisfy through evidentiary proof" that least one of the bases for certification in Rule 23(b) is met.  *Id.* at 1432.  At issue here is Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The party seeking certification bears the burden of demonstrating that it has met all of these requirements, and "the trial court must conduct a 'rigorous analysis'" to determine whether it has met that burden.  *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996)).

The Court is required to take the substantive allegations of the complaint as true. *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982) (internal citation omitted).   Further, because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action[,]" the Court's analysis also "frequently entail[s] overlap with the merits of the plaintiff's underlying claim."  *Id.* (internal quotation marks and citations omitted).  Consideration of the merits, however, must not be "free-ranging"; rather, any such consideration must be strictly limited "to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1194–95 (2013).

Mix proffers two classes and one sub-class of individuals for certification.  Class 1 or the "Asurion Class" represents "[a]ll individuals in the United States about whom Asurion, from October 23, 2012 to present, (1) obtained a background screening report from Sterling (2) in connection with the individual's application for employment."  (Doc. 65 at 11.)

Sub-Class 1 or the "Asurion Sub-Class" represents "[a]ll members of the Asurion Class (1) (i) who Asurion informed could not proceed with the hiring process, or (ii) whose name was requested to be removed from Asurion's list of expected new employees (2) before Asurion provided a copy of the report to the individual." (*Id.*)

Class 2 or the "Sterling Class" represents "[a]ll individuals in the United States about whom Sterling, from October 23, 2012 to present, (1) prepared a background screening report containing the results of a search for criminal records, (2) based on a request submitted through a client's pre-employment background screening program (3) where Sterling furnished the report to its client through its ScreeningDirect, SterlingDirect (East), or AISS background screening platforms, and (4) either (i) the report contained an adjudication of 'Fail,' 'Alert,' 'Yellow' 'Level2,' 'Red,' or 'Level3,' or (ii) to whom Sterling mailed, at the request of the client and in connection with the report, a pre-adverse action letter on the same day as it delivered the report to the client." (*Id.*)

### A.   Rule 23(a)(1):  Numerosity

The first prerequisite of Rule 23 is that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "A proposed class of at least forty members presumptively satisfies the numerosity requirement."  *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473 (C.D. Cal. 2012) (citing *Jordan v. L.A. Cty.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds by Cty. of L.A. v. Jordan*, 459 U.S. 810 (1982)).  No party contends that numerosity is not met with respect to any of the classes.

### B.   Rule 23(a)(2)–(4):  Commonality, Typicality, and Adequacy

A Rule 23 class is certifiable only if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Further, "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The representative parties must also "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  These three inquiries "tend to merge."  *Wal-Mart Stores, Inc. v.*

1    *Dukes*, 564 U.S. 338, 349 n.5 (2011).  That is so here, and the Court will discuss only

2    those aspects of the inquiry that each class fails to satisfy.  *See id.*

3                    **1.    Sterling Class**

4            Mix asserts two common questions of law, each going to a different sub-part of

5    the overall class.   As such, Mix's putative Sterling Class may be understood as

6    comprising two informal, overlapping "sub-classes."   The first "sub-class" represents

7    individuals for whom Sterling prepared a background check and "adjudicated" the

8    background check with a negative[5] rating ("adjudication sub-class").   The second "sub-

9    class" represents individuals to whom Sterling sent a pre-adverse action letter that also

10   contained a copy of the background check ("notice sub-class").[6]   Mix asserts as to the

11   adjudication sub-class the common question of "whether Sterling takes adverse action

12   against a consumer under § 1681b(b)(3) when (1) it communicates an adverse score or

13   rating on the client's matrix or adjudication grid . . . ."  (Doc. 65 at 21.)  As to the notice

14   sub-class, Mix asserts the common question of "whether Sterling takes adverse action

15   against a consumer under § 1681b(b)(3) when . . . (2) [it] sends a pre-adverse action letter

16   containing language that makes it appear that the adverse decision has already been

17   made."   (*Id.*)   Mix herself, and presumably a significant number of potential Sterling

18   Class members, would be in both "sub-classes."   Similarly, the two common legal

19   questions ultimately boil down to one:  whether Sterling, a CRA, *can* engage in adverse

20   action subject to § 1681b(b)(3) by furnishing adjudicated background checks or sending

21   pre-adverse action notices on behalf of clients.   The notice sub-class also implicates

---

23   [5] Specifically, "'Fail,' 'Alert,' 'Yellow[,]' 'Level2,' 'Red,' or 'Level3.'"  (Doc. 65
24   at 11.)

25   [6] The class, as defined, includes only those individuals who received a negative
     rating or a pre-adverse action letter, or both.   Mix asserts that "forensic analysis" of
26   Sterling's servers would provide a method of ascertaining the class membership, (Doc. 65
     at 22), and presents evidence indicating that this is feasible, (Doc. 65-16 at 1–2).   The
27   alleged injury is simply receiving the negative rating or the pre-adverse action letter, and
     there would thus be no need for the Court to conduct numerous "mini-trials" to adjudicate
28   whether a particular class member suffered the alleged harm.  *See United Steel, Paper &*
     *Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO,*
     *CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010).

§ 1681b(b)(1), under which a CRA must obtain a certification from an employer that the employer will comply with § 1681b(b)(2) and § 1681b(b)(3).  There is thus a factual question of whether Sterling obtained such a certification from each of its employer-clients.

Sterling asserts that Mix's proposed common questions of law are legally foreclosed.  Specifically, Sterling argues that CRAs are not typically subject to § 1681b(b)(3) duties because a CRA's conduct of adjudicating or furnishing consumer reports to employers or pre-adverse action letters to prospective employees on behalf of clients cannot constitute adverse action.  Courts have held to the contrary.  Section 1681a(k)(1)(B)(ii) defines adverse action in the employment context as "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee."  In *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319 (D. Conn. 2009), the court, focusing on the "any other decision" language of § 1681a(k)(1)(B)(ii), held that a jury could find that a CRA who simply "made the decision to furnish a background" report to an employer for employment purposes which contained information adverse to the prospective employee engaged in adverse action subject to the requirements of § 1681b(b)(3).  *Id.* at 332–33.  In *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 538–39 (E.D. Pa. 2012), the court found that a CRA who negatively "adjudicated" a prospective employee, and sent a report to an employer who did not review it, likewise engaged in adverse action.  *Id.*

Sterling focuses on *Goode*[7] and contends that although the *Goode* court found that a CRA could have § 1681b(b)(3) duties, it was because there were facts that the "employers wholly delegated initial and final authority to make employment decisions on to the CRA . . . ."  (Doc. 81 at 11.)  Sterling asserts that if such a specific type of

---

[7] The Court likewise finds *Goode* more applicable here.  The CRA in *Adams* was an employment staffing agency that provided employees to client-employers on a contract basis, rather than—as here and in *Goode*—a background check agency that "adjudicated" the prospective employee.  *Adams*, 620 F. Supp. 2d at 322–23.  The *Goode* court rejected this distinction in dicta but ultimately based its holding on the CRA in its case having done "more than simply send[ing] the report to plaintiffs' employers."  *Goode*, 848 F. Supp. 2d at 539.

relationship between the employer and the CRA is necessary, then to certify the class, the relationships between Sterling and each of its clients would need to be individually analyzed, thus defeating commonality.  (*Id.* at 22.)  But *Goode* did not require such an explicit delegatory relationship between the employer and the CRA for the CRA to engage in adverse action.  To the contrary, *Goode* noted that "any person who takes an adverse action must comply with § 1681b(b)(3)(A), be it a CRA, an employer, or a staffing agency . . . even [if] the party taking the adverse action did not have the ultimate authority to make the hiring decision." *Id.*

But it is consistent with *Goode* and with the language of § 1681a(k)(1)(B)(ii) to find that the *degree* of review and particular method of use undertaken by Asurion and every other Sterling client "is relevant to whether Sterling has 1681b(b)(3) duties." (Doc. 81 at 22.)  *Goode*, for example, highlighted that the employer in that case "did not conduct any review of the adjudication" by the CRA before making an employment decision, such that the CRA's "adjudication of plaintiffs [was], quite literally," an adverse action.  848 F. Supp. 2d at 539.  "[A]dverse action occurs when the decision is carried out, when it is communicated or actually takes effect." *Id.* at 540.  *Goode* explained that the CRA's "adjudication of plaintiffs . . . actually [took] effect before [the CRA] sent out the pre-adverse action letters because there was no real opportunity for plaintiffs to contest the adjudication or change its outcome thereafter.  This scheme is missing the crucial last step . . . where the employer makes a final decision based on both the report and any information the employee uses to contest the report." *Id.*  An employer's degree of review or particular use of the adjudicated report are thus relevant to determine when a decision is carried out, communicated, or takes effect such that the decision constitutes an adverse action.  Thus, individual inquiries into each of Sterling's client's interactions with Sterling's reports would be necessary.

Mix set forth evidence as to how Asurion reviews and uses Sterling's adjudicated background checks across Sterling's various platforms.  Mix presented, for example, statistics on the number of background checks Sterling adjudicated "red" versus the

number of pre-adverse action notices Asurion ordered to be sent.  (*See* Doc. 88 at 5–8.)
The evidence was extensive and delved into details of Asurion and Sterling's relationship
and interaction.  But Sterling has over 8,000 unique clients, each with their own number
of individuals on whom Sterling ran background checks and to whom Sterling sent pre-
adverse action notices.  (Doc. 81 at 17–20.)  Each client may (and likely does) review and
use Sterling's adjudicated background checks in a unique manner.  Mix argues that she
also presented evidence that other clients interacted with Sterling in a similar fashion, and
that other clients used a three-tiered client matrix like Asurion.  Even if Mix's evidence
proved that those clients acted similarly to Asurion, it covers only a small fraction of the
thousands of Sterling clients Mix attempts to include in the Sterling Class.  Moreover, the
utilization of a three-tier client matrix does not by itself create commonality.  A client
matrix simply provides Sterling with a guideline on how it is to rate the results of an
individual's background check against the client's specific hiring parameters; it does not
shed light on how and whether any particular application of a particular client matrix
could be identified as an adverse action.

The "common" question of whether Sterling engaged in adverse action under
FCRA can only be answered by examining the relationship and interaction between
Sterling and each of its clients.  Even if the Court were to determine that Sterling and
Asurion have the requisite relationship, and it is not at all clear that they do, such a
determination would not indicate whether Sterling and a different client do as well.  Mix
fails to establish that any evidence could prove such a relationship across the entire class
without the need for the Court to engage in numerous impermissible threshold "mini-
trials."  *See United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv.
Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir.
2010).  There is no evidence that will provide the requisite "common answer[] apt to
drive the resolution of the litigation"; there is no common contention that is capable of
resolving each putative class member's claim "in one stroke."  *Dukes*, 564 U.S. at 350.
Moreover, while in theory each putative class member who was subject to adverse action

may have suffered from a common violation of § 1681b(b)(3), they may not have suffered from the same injury, because it cannot be determined through common evidence whether Sterling is engaging in adverse action or whether, on the basis of specific facts about the particular Sterling-client relationship, it is the client who engages in adverse action.  *See id.*  Nevertheless, Mix claims that she "will be able to present common evidence to show that Sterling is aware that its clients . . . merely [provide] 'a *pro forma* period between the preliminary and final decision.'"  (Doc. 88 at 12 (quoting *Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 633 (D. Or. 2015).)  Even if true, this does not solve the commonality issue with respect to § 1681b(b)(3), because while such evidence could indicate that Sterling's clients are violating § 1681b(b)(3), it does not prove that Sterling is engaging in adverse action.

Further, with respect to § 1681b(b)(1) and Count V, Mix presents no factual basis on which this Court could conclude that Sterling failed to obtain a required certification from *every* one of over 8,000 employer-clients.  She claims that she will provide such a basis, but such unsupported assurances are not sufficient for this Court to certify the class.

For these reasons, Mix has not satisfied Rule 23(a)(2)'s requirement of commonality.  Mix's motion to certify the Sterling Class is thus denied.[8]

### 2.    Asurion Class and Asurion Sub-Class

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Id.* (internal citation omitted).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

---

[8] Sterling's motion for leave to file a sur-reply (Doc. 94) is denied.

984 (9th Cir. 2011) (quoting *Hanon*, 976 F.2d at 508) (internal quotation marks omitted).

The "adequacy requirement" means "the named plaintiffs and their counsel [do not] have any conflicts of interest with other class members" and will "prosecute the action vigorously on behalf of the class." *Id.* at 985.  This inquiry has a tendency to overlap with the commonality and typicality criteria of Rule 23(a).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).  These requirements serve to ensure that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).  A named plaintiff does not satisfy the typicality or adequacy requirements if she is subject to unique defenses that threaten to become the focus of the litigation.  *Ellis*, 657 F.3d at 984.

The Asurion Class and the Asurion Sub-Class, dealing as they do with a single employer rather than 8,000, do not suffer from the same defect in commonality as does the Sterling Class.  Mix alleges that the initial FCRA disclosure was improperly included with other documents, and that Asurion informed her of its intent to revoke her employment offer because of the results of Sterling's background check, placed Mix's name on the "will not start" list, and prevented her from starting all before she received a copy of her background check and a description of her rights under FCRA in compliance with § 1681b(b)(3).  The proposed Asurion Class and Asurion Sub-Class mirror those claims.

Asurion, however, cites certain facts to show the existence of unique defenses against Mix's claim.  Asurion notes that Mix did not dispute her background report even after eventually receiving it. But whether a class member actually disputed their background check is ultimately irrelevant to the alleged FCRA violation underlying the Asurion Sub-Class:  that Asurion did not provide putative class members with a "real opportunity" to contest the background check because Mix did not receive a copy of the background check (and instruction that she could contest it) until, at the earliest, she received a letter from Asurion (sent by Sterling) informing her that her offer had been

revoked.  *See Magallon*, 311 F.R.D. at 634 (quoting *Goode*, 848 F. Supp. 2d at 540).

Asurion also argues that Mix's background check revealed that she had pending criminal charges "involving dishonesty," which, if they resulted in a conviction, would fall under the CCLEA and legally prohibit Asurion from hiring her.  (Doc. 79 at 20–21.) It may be that Mix's claim is atypical as to the nature of her background check results, and the possible legal restraints placed on Asurion as a result.  But these issues are ultimately beside the point.  The underlying results of an individual's background check are irrelevant to whether Asurion's actions violated FCRA.  The alleged injuries are deprivations of informational rights and privacy rights.  These rights are equally implicated whether the prospective employee was ultimately hired, ultimately not hired on the basis of accurate information, or ultimately not hired on the basis of inaccurate information.  "Differing factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality."  *Ellis*, 657 F.3d at 985 n.9.

What does defeat typicality, along with adequacy, is that Mix's claim is *not* of the same nature as other potential class members in important respects.  She can bring no claims for negligent infringement of the statute by the Defendants, because she suffered no actual damages from any of the Defendants' actions.  She can thus only bring a claim for statutory damages which requires her, on behalf of all class members to establish a higher degree of scienter on the part of the Defendants to establish any claim.  It further limits the recovery of all class members to the limited statutory damages set forth in the statute when some class members could qualify to receive actual damages which could be significant.

Class members who may have lost an employment opportunity thanks to an erroneous report, and therefore suffered actual damages, would be precluded from seeking actual damages.  Mix acknowledges this, but argues that she is an adequate representative because any actual damages would not exceed the statutory damage maximum.  This—so goes the argument—is because if Asurion had "given the class members a copy of their report and notice of their rights on the first day of training and

given them the entire first week to address the content of their report," then that would not have been a FCRA violation, and therefore "the most damages could reach is a single week's pay." (Doc. 87 at 8.) But this conclusion only follows if it is assumed that every putative class member is someone whose background check results were accurate. A prospective employee whose background check was erroneous, but who, thanks to late notice of the problem, was forced to take a different and lower-paying job, might well have actual damages which would easily exceed the statutory limit. Crucially, Mix proffers no evidence that the great majority of the class comprises people whose background checks were accurate. Without this, Mix's assumption that this Court would be justified in eliminating the recovery of actual damages for any class members who might be entitled to such damages is not accurate. Without this, Mix can hardly argue that she is a typical or adequate representative.

Other courts have held in the context of different claims that the possibility of some class members being eligible for actual damages should not preclude certification of a class with a representative seeking only statutory damages. *See, e.g.*, *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification. When a few class members' injuries prove to be substantial, they may opt out and litigate independently. . . . Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether."); *Santoro v. Aargon Agency, Inc.*, 252 F.R.D. 675, 683 (D. Nev. 2008) (finding a named plaintiff seeking statutory damages adequate to represent putative class members who suffered actual damages while holding open possibility of "ordering joinder of [plaintiff seeking actual damages] as a co-class representative to ensure adequate representation of the whole class"). The facts of those cases, however, were different in an important respect. The Seventh Circuit in *Murray* addressed a "credit solicitation" letter sent in violation of certain FCRA requirements. 434 F.3d at 950. The

District of Nevada in *Santoro* addressed "form collection letters" sent in violation of certain requirements under the Fair Debt Collection Practices Act.  252 F.R.D. at 679.  In each case, because of the nature of the violation, it was reasonable for the court to assume that only "a few class members' injuries [would] prove to be substantial."  *See Murray*, 434 F.3d at 953.  This case, on the other hand, involves employment-related background checks.  As discussed above, it is more reasonable here to assume that "personal injuries [may be] large in relation to statutory damages," *see id.*, for a significant number of class members.  This potential differentiation as to the extent and amount of actual damages within the proposed class weigh against a finding that Mix is a typical or adequate representative.

Limiting all class claims to those for the Defendants' willful infringement of the statute for which the class members would only then receive statutorily limited damages does make the claims more amenable to class treatment.  It does so, however, at the expense of legitimate claims that are held by class members who may have suffered significant actual damages and who could establish the less demanding negligence standard.  Certifying the class as a 23(b)(3) class would ultimately terminate such claims of any class member who did not opt out, when there is no compelling basis to believe that notices of class action are read or understood by most of those who receive such notices.  *See* Mohsen Manesh, *The New Class Action Rule: Procedural Reforms in an Ethical Vacuum*, 18 Georgetown J. Legal Ethics 923, 933–34 (2005) ("Notices sent to class members are often lengthy, confusing, and largely ineffective.  These notices are written in cryptic legalese, some incomprehensible to a trained lawyer[,] let alone an ordinary class member.").  Further, it is not necessary to accumulate such claims to attract attorney-representation to bring them since Congress has authorized attorney's fees awards for those who bring such claims successfully.[9]

---

[9] Courts differ on the significance of attorney's fee provisions in the class action analysis.  *Compare, e.g.*, *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 449 (6th Cir. 2002) (finding a statutory "provision of the award of attorney's fees and costs to successful plaintiffs eliminates any potential financial bar to pursuing individual claims"), *with Tchoboian v. Parking Concepts, Inc.*, No. SACV 09-422 JVS (ANx), 2009

There is another problem of typicality with respect to damages, even setting aside the issue of actual damages. FCRA sets statutory damages at between $100 and $1,000, without further guidance as to how to decide what amount to award a plaintiff. As such, it is arguable that, even under a statutory damages regime, any individual plaintiff's actual injury may be relevant to calculating their statutory damage amount. The Ninth Circuit suggested this in *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990), a case involving the Farm Labor Contractor Registration Act ("FLCRA"), which also provides for statutory damages in the absence of proof of actual injury. *Id.* at 1306. There, the Ninth Circuit invalidated as excessive a district court's award of statutory damages in a class action because certain "individual awards exceeded what was necessary to compensate any potential injury from the violations." *Id.* at 1309; *see also Andrade v. Chase Home Finance, LLC*, No. 04 C 8229, 2005 WL 3436400, at *6 (N.D. Ill. Dec. 12, 2005) (noting that "evidence of actual damages" is "potentially quite meaningful" in "calculating the appropriate amount of statutory damages"); *but compare Ashby v. Farmers Ins. Co. of Or.*, 592 F. Supp. 2d 1307, 1318 (D. Or. 2008) ("The Court concludes the factor most germane to the amount of a statutory-damages award to class members is the jury's perception of the importance, and hence the value, of the rights and protections conferred on the consuming public by FCRA's adverse-action notice requirements."). Within the statutory range, then, there could be wide variation between class members who suffered actual damages—which should be reflected in the statutory award they receive—and those who did not.

To certify a class with Plaintiff Mix as class representative would forego the ability of any class member to pursue actual damages. Further, it would shoehorn potentially meritorious suits seeking actual damages on a negligence theory into a class

---

WL 2169883, at *9 (C.D. Cal. July 16, 2009) ("The Court is not convinced that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of the FCRA by individual actions of a scale comparable to the potential enforcement by way of class action."). Here, the availability of attorney's fees underscores the fact that potentially numerous plaintiffs with actual damages would have everything to gain and nothing to lose by pursuing individual suits instead of a class action.

that would only recover, if successful, statutory damages on a harder-to-prove willfulness theory.   Class certification as to the Asurion Class and the Asurion Sub-Class must therefore fail for lack of typicality and adequacy under Rule 23(a)(3) and (a)(4).[10]

## CONCLUSION

Plaintiff Amanda Mix has standing to bring her claims against Defendants Asurion Insurance Services Inc. and Sterling Infosystems, Inc.   Plaintiff's proposed classes, however, fail to meet the requirements of Federal Rule of Civil Procedure 23(a).

**IT IS THEREFORE ORDERED** that the Motion for Class Certification of Plaintiff Amanda Mix (Doc. 65) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Leave to File a Sur-Reply of Defendant Sterling Infosystems, Inc. (Doc. 94) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss of Defendant Sterling Infosystems, Inc. (Doc. 107) is **DENIED**.

Dated this 14th day of December, 2016.

Honorable G. Murray Snow
United States District Judge

---

[10] For the same reasons, Mix would not be a typical or adequate representative for the proposed Sterling class, which therefore fails under Rule 23(a)(3) and (a)(4) in addition to, as discussed earlier, Rule 23(a)(2).